108 P.3d 787 (2005)
126 Wash.App. 34
MAISON DE FRANCE, LTD., a Washington corporation, Respondent,
v.
MAIS OUI!, INC., a Washington corporation; C'est La Vie!, Inc., a Washington corporation; Molly Marking and John Doe Marking, wife and husband, and the marital community comprised thereof; Nancee Rostad, and John Doe Rostad, wife and husband, and the marital community composed thereof; Caroline Beaupere and John Doe Beaupere, wife *788 and husband and the marital community comprised thereof; and Judith White and John Doe White, wife and husband, and the marital community comprised thereof, individuals residing in the State of Washington, Appellants.
Mais Oui!, Inc., a Washington corporation, Molly Marking, and Nancee and Rich Rostad, Third-Party Plaintiffs/Appelants,
v.
Maison de France, Ltd., a Washington corporation and Blaise Bouchand and Jane Doe, wife and husband and Martial community, Third-Party Defendants/Respondents.
No. 53130-1-I.
Court of Appeals of Washington, Division 1.
January 31, 2005.
Publication Ordered February 28, 2005.
*790 Thomas E. Loop, Timothy B. McCormack, Delbert J. Barnard, Barbard Loop & McCormack LLP, Seattle, for Appellants.
Randy Barnard, Bellevue, for Respondent.
APPELWICK, J.
¶ 1 Two retailers of French housewares, C'est La Vie and Mais Oui!, and their owners and employees, sued Maison de France, another retailer of French housewares, alleging, among other claims, defamation. The trial court concluded that the publications at issue were substantially true in their stinging points. We conclude that some portions of one publication were materially false and defamatory per se. We affirm in part. We reverse in part and remand.

FACTS
¶ 2 In September 1998, Blaise Bouchand (Bouchand) and his wife, Jasmine Bouchand, opened Maison de France, a retail shop in Bellevue that sells French furnishings and housewares.
¶ 3 Bouchand hired Nancee Rostad (Rostad) in 1997 to work at Maison de France as a buyer and liaison with French vendors. In late 1998, about three months after Maison de France opened, Bouchand fired Judith White (White), another Maison de France employee. The following week, Rostad submitted her letter of resignation to Bouchand.
¶ 4 Rostad, White, and Karen Lewis Smith (Smith) formed C'est La Vie, Inc. (C'est La Vie), which was incorporated in April 1999. C'est La Vie was not a retail store. Rather, Rostad, White, and Smith planned to hold "two shows" in a rented space each year, at which they would offer French housewares for sale. C'est La Vie stocked its first show in May 2000 with merchandise acquired from about thirty to thirty-five vendors. About eight of the vendors also supplied Maison de France with products. Rostad testified at trial that the Bouchands visited the May 2000 show to check C'est La Vie's prices on merchandise. Although the May 2000 show grossed $30,000, after expenses C'est La Vie lost about $7,000 on it. Rostad testified that products from a French vendor named Terre e Provence were some of the best-selling items at the May 2000 show.
¶ 5 C'est La Vie's second sales event was planned for November 2000. To stock its second show, C'est La Vie placed orders with at least some of the same vendors that stocked its May 2000 show. C'est La Vie placed an order for the November show with Terre e Provence in June 2000. Rostad testified that Terre e Provence "told us that *791 they were not going to do business with us." The record does not indicate when Terre e Provence communicated its refusal to fill C'est La Vie's order.
¶ 6 On or around September 8, 2000, Bouchand sent a letter to vendors in France who had been providing merchandise to Maison de France. The English translation of the September 8, 2000 letter states:
¶ 7 Re: Important Information
Dear Madame, Dear Sir,
I hereby notify you that Maison de France, Ltd. No longer employs as of the end of 1998 and beginning of 1999 the following former employees:
 Caroline Beaupere
 Nancee Rostad
 Judith White
These persons were discharged or were forced to resign for serious misconduct.
Maison de France, Ltd. has no direct or indirect relationship with the named persons that conduct business under the company name "C'est la Vie" which is the object of an investigation by U.S. Customs, the FDA and the Seattle Police for multiple counts of fraud.
Maison de France, Ltd. has become since 1999 a family company since my wife and partner, Jasmine Bouchand, works with me. We are the sole authorized buyers for the Maison de France, Ltd.
...
 Blaise Bouchard, president
 Maison de France, Ltd.
The record does not show which vendors, or precisely how many vendors, received the September 8th letter, but Bouchand testified that it was sent to approximately 150 vendors in France.
¶ 8 Rostad testified that she made the decision, "Right before" the November 2000 sales event, that she didn't want to go forward with C'est La Vie, because it would not be profitable. "[Rostad] informed White of that before the second event, and [she] informed Karen Lewis Smith of that fact during the [November sales] event." Rostad explained in a letter to White and Smith that one reason she resigned from C'est La Vie was that it "lacked money-making potential." Rostad testified that her decision to leave C'est La Vie severely strained her relationships with White and Smith. The November 2000 sales event grossed approximately $40,000 with a loss of approximately $6,000. Smith sold her shares in C'est La Vie in November 2001. Rostad sold her shares in C'est La Vie to her husband, Richard Rostad, in September 2002.
¶ 9 In December 2000, Molly Marking (Marking), who was interested in opening a retail shop selling French housewares and wine, incorporated Mais Oui!. Marking employed Rostad as buyer and visual merchandiser. Mais Oui! opened as a retail shop in Bellevue, about one block from Maison de France, in June 2001.
¶ 10 Mais Oui! purchased goods from approximately French 125 vendors. Six or seven of those vendors also sold products to Maison de France. Marking and Rostad traveled to France to attend a semi-annual housewares show, Maison et Objet, to place orders for Mais Oui!. Marking testified that she first became aware of Bouchand's September 8th letter to French vendors when she and Rostad attended the January 2001 Maison et Objet show.
¶ 11 Rostad testified that Crossings refused to fill a Mais Oui! order placed in April 2001. Although Marking testified that Mais Oui! had lost about $20,000 by not having Crossing food items, Rostad testified that Mais Oui! had found an alternative source for the products it desired, so Mais Oui! was "no longer interested" in Crossings products. Mais Oui! placed an order with Idex, another vendor, in early September 2001. Idex initially refused to fill the order, then agreed to fill it, but informed Mais Oui! that they would not fill any future orders. Mais Oui! never attempted to place orders with Idex after September 2001.
¶ 12 On or about April 22, 2001, Bouchand sent a letter to a number of vendors in France which had been providing Maison de France with merchandise. The English translation of the April 22, 2001 letter states:
 Bellevue, April 22, 2001
 Attention: Souleiado
*792
 Helene, Service Export
RE: Important Information
Dear Madam:
I thank you for your honest and professional decision that we appreciate. We are honored to represent our French vendors, of course, we know them to be of French origin. This is the address of that new store that is situated facing our store on the same street:
 Mais oui!
 Molly Marking, owner
 1075 NE 10th Street & Bellevue Way
 Bellevue, WA 98004
...
The following people are no longer a part (no longer associated with, no longer working for) of Maison de France, for a[sic] least two years. Please note that these people have no relation to our store, they have been trying (using all available means) to obtain credit from our vendors including lying about their names and about the store for which they are working and their address. This information is very important as it concerns our relationship with you. Here is the list:
-Nancee Rostad
-Caroline Beaupere
-Judith White
These people are friends of Molly Marking and work as buyers for Mais oui!. Unfortunately, you are not the only vendor that these ex-employees have contacted. We have been informed that these ex-employees have stolen and copied the concept and the identity of Maison de France. Fortunately, Maison de France is a registered trademark in the United States, therefore we are the only owners. Thank God, the law protects us. We are doing all that is within our power to protect our trade name and our trademarked image. Fortunately, the `pseudo' store Mais Oui! will without a doubt not open by virtue of the law of the State of Washington.
I know that you believe in family enterprises. You have always indicated to us that we are your only client in Washington State.
We know that you don't wish to have your products sold in 2 stores situated in the same city, much less on the same street, especially if you already have an client with which [we] have worked for several years. We would appreciate it if you would be able to sign this letter and then fax it to us.
Thank you in advance.
Best regards,
We will see you in September at the Maison et Object.
Blaise & Jasmine Bouchand
Maison de France
The record does not show which vendors, or how many vendors, received the April 22nd letter, or whether the recipients of the September 8th letter also received the April 22nd letter.
¶ 13 In May 2001, Maison de France filed a complaint in King County Superior Court against Mais Oui!, alleging intentional interference with contractual relations, misappropriation of trade secrets, breach of duty of loyalty, and violations of the consumer protection act. Maison de France later voluntarily withdrew its charges, but not before the appellants filed counterclaims. The appellants' counterclaims included allegations that the Sept 8th and April 22nd letters had defamed them.
¶ 14 After litigation had commenced, John Coe (Coe) an attorney representing Maison de France, sent a letter to the executive director of the French-American Chamber of Commerce of the Pacific Northwest (Coe Letter). Coe's letter requested that the appellants be denied admission to the Chamber of Commerce. Rostad requested damages for "emotional, physical, relational, business loss, business expectations, attorney fees, lost cash, lost cash business, lost profits past, lost profits future, reputation personal past, reputation business past, reputation personal future, reputation business future, and nominal damages."
¶ 15 Following a bench trial, the trial court concluded that the Coe letter "sets forth accurate information about the pending lawsuit between the parties that was available to the public in the records of the court," and *793 therefore did not defame the appellants. The trial court also dismissed the appellant's defamation claims based on the September 8, 2002 and April 22, 2000 letters, concluding that "in their `stinging points' Exhibit 11 and Exhibit 13 are substantially true[.]" Finally, the trial court found that the appellants "failed to establish any economic damage, damage to reputation or emotional distress damages proximately caused by [the respondents'] conduct." In its oral ruling, the trial court concluded:
In Washington, [a] defamation plaintiff can recover damages only if he or she proves that damages were proximately caused by the defendant's wrongful conduct. It is simply not enough to presume damages flow from a defamatory statement. The plaintiff still bears the burden of showing that the defamatory statements proximately caused the resulting damages. Schmalenberg v. Tacoma News, [87 Wash.App. 579, 943 P.2d 350 (1997)].

ANALYSIS

I. Standard of Review
¶ 16 When the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment. Ridgeview Prop. v. Starbuck, 96 Wash.2d 716, 719, 638 P.2d 1231 (1982). Substantial evidence exists when the evidence is in "sufficient quantum to persuade a fair-minded person of the truth of the declared premise." Ridgeview Prop., 96 Wash.2d at 719, 638 P.2d 1231. This Court reviews questions of law de novo. Mountain Park Homeowners Assn., Inc. v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994). Whether a given communication constitutes defamation per se may be either a question of law or a question of fact. "The imputation of a criminal offense involving moral turpitude has been held to be clearly libelous per se." Caruso v. Local Union No. 690 of Int'l Brotherhood of Teamsters, 100 Wash.2d 343, 353, 670 P.2d 240 (1983) (citing Ward v. Painters' Local 300, 41 Wash.2d 859, 252 P.2d 253 (1953)) In the vague areas of public confidence, injury to business, etc.
Where the definition of what is libelous per se goes far beyond the specifics of a charge of crime, or of unchastity in a woman, into the more nebulous area of what exposes a person to hatred, contempt, ridicule or obloquy, or deprives him of public confidence or social intercourse, the matter of what constitutes libel per se becomes, in many instances, a question of fact for the jury.
¶ 17 Caruso, at 354, 670 P.2d 240, (citing Purvis v. Bremer's, Inc., 54 Wash.2d 743, 752, 344 P.2d 705 (1959).) "In all but extreme cases the jury should determine whether the article was libelous per se." Caruso, at 354, 670 P.2d 240 (citing Miller v. Argus Pub'g Co., 79 Wash.2d 816, 820 n. 3, 821 n. 4, 490 P.2d 101 (1971); Amsbury v. Cowles Pub'g Co., 76 Wash.2d 733 at 740, 458 P.2d 882 (1969).)

II. Defamation
¶ 18 The appellants claim that the trial court erred in dismissing their defamation claims because the September 8, 2000 and April 22, 2001 letters which Bouchand sent to vendors in France, and the September 6, 2001 letter which Coe sent to the French-American Chamber of Commerce, constitute per se defamation.
¶ 19 A defamation plaintiff must prove four elements: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. LaMon v. Butler, 112 Wash.2d 193, 197, 770 P.2d 1027, cert. denied, 493 U.S. 814, 110 S.Ct. 61, 107 L.Ed.2d 29 (1989). The court examines alleged libel under one of two standards. "[T]he necessary degree of fault depends on whether the plaintiff is a private individual or a public figure or public official." Caruso, 100 Wash.2d at 352, 670 P.2d 240. "When the defamed party is a public figure or public official, he or she must establish actual malice. If, on the other hand, the defamed party is a private figure, only negligence need be shown." Demopolis v. Peoples Nat'l Bank, 59 Wash.App. 105, 108 n. 1, 796 P.2d 426 (1990) (citing LaMon, 112 Wash.2d at 197, 770 P.2d 1027). "The negligence standard is that the defendant knew or, in the exercise of reasonable care, should *794 have known that the statement was false or would create a false impression in some material respect." Vern Sims Ford, Inc. v. Hagel, 42 Wash.App. 675, 680, 713 P.2d 736 (1986) (citing Taskett v. KING Broadcasting Co., 86 Wash.2d 439, 445, 546 P.2d 81 (1976)). Actual malice is a heightened standard, and is "knowledge of the falsity or reckless disregard of the truth or falsity of the statement." Vern Sims, 42 Wash.App. at 680-81, 713 P.2d 736 (citing Caruso, 100 Wash.2d at 354, 670 P.2d 240). The court added:
Actual malice ordinarily may be inferred from objective facts, and evidence of negligence, motive and intent, by cumulation and appropriate inferences, may establish the defendant's recklessness or knowledge of falsity. Further, the defendant's mere statement of his belief in the publication's truth must be weighed against evidence adduced that supports a finding of knowing falsity or recklessness.
Vern Sims, at 681, n. 2, 713 P.2d 736.
¶ 20 The appellants argue that under either a negligence or actual malice standard, they were not obliged to prove damages at trial because the letters at issue constitute defamation per se, under which damages need not be proven. "A defamatory publication is libelous per se (actionable without proof of special damages) if it (1) exposes a living person to hatred, contempt, ridicule or obloquy, to deprive him of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office." Caruso, 100 Wash.2d at 353, 670 P.2d 240. A publication is also libelous per se if it imputes to the plaintiff criminal conduct involving moral turpitude. Ward v. Painters' Local Union No. 300, 41 Wash.2d 859, 863, 252 P.2d 253 (1953). Truth is an absolute defense to a per se defamatory statement.[1]Ward, 41 Wash.2d at 862, 252 P.2d 253.

A. Falsity

1. The September 8, 2000 letter[2]
¶ 21 The appellants assert that the September 8th letter written by Bouchand was defamatory per se. They first argue that it was untrue that "Caroline Beaupere and Judith White and appellant Nancee Rostad were discharged for serious misconduct" as stated in the September 8th letter.
¶ 22 The trial court's findings included the following:
1.2 Nancee Rostad was an employee of Maison de France, working as buyer and liaison with French vendors who provided the merchandise for the store. While working as an employee of Maison de France Ms. Rostad and her husband, Rich Rostad, attempted to buy the company. When Mr. Bouchand refused to sell the company, Ms. Rostad approached the company's banker and landlord. She accused Mr. Bouchand of incompetence and asked the banker and the landlord to pressure Mr. Bouchand into selling the company. Upon learning that Mr. Bouchand had discovered her actions, Ms. Rostad terminated her employment with Maison de France.
1.9. [The September 8th letter] correctly states that Caroline Beaupere, Nancee Rostad and Judith White, former employees of Maison de France, had either been fired or forced to resign due to misconduct and that these persons were no longer authorized to act for Maison de France.
The trial court concluded that the September 8th letter was "substantially true" in its "stinging points."[3]
¶ 23 Nancee Rostad testified that she and Judith White met with Bouchand's banker after Bouchand refused Rich Rostad's offer to buy Maison de France. When Bouchand learned of Rostad and White's visit with his banker, he informed them that "if any of his *795 employees shared information about the company outside the company that they would be in trouble." About two to three weeks later, Bouchand fired White. Rostad testified that she submitted her letter of resignation to Bouchand shortly after White was fired. Rostad's testimony was sufficient for the trial court to infer that Rostad was "forced to resign due to misconduct." The record also supports the trial court's finding that Judith White had been fired from Maison de France.[4] The trial court did not err when it concluded that the statement in the September 8th letter stating that White and Rostad had been fired or discharged for serious misconduct was substantially true.
¶ 24 The September 8th letter also included a second paragraph stating that C'est La Vie is "the object of an investigation by U.S. Customs, the FDA and the Seattle Police for multiple counts of fraud."
¶ 25 At trial, Jasmine Bouchand testified that a customer complained to her about an expired date on a food product. She surmised that the customer had confused Maison de France with C'est La Vie because "Judith, merci" was interlineated on the customer's receipt for the food item and Judith White was part of C'est La Vie. Jasmine Bouchand further testified that soon thereafter, she received a phone call from the Food and Drug Administration inquiring whether the expired food item had been purchased at Maison de France. She testified that she had also received a phone call from the Seattle Police Department about the expired food item. Jasmine Bouchand further testified that she had no personal knowledge that C'est La Vie had been investigated by U.S. Customs, explaining only, "[W]e heard there was something going on. I don't remember exactly what we heard. Someone told us."
¶ 26 Finding of Fact 1.10 stated:
At the time that Mr. Bouchand wrote [the September 8th letter] he was aware that some kind of investigation had been made into the business of C'est la Vie because Maison de France had been contacted by a field agent for the FDA and a police officer making inquiry into C'est la Vie products.
The trial court concluded that the September 8th letter was substantially true in its stinging points.
¶ 27 The record does not support the trial court's conclusion regarding the second paragraph of the September 8th letter. At best, the evidence suggests that on a single occasion, the Seattle police and the FDA contacted Maison de France regarding a sale to one customer of one expired food item. This evidence does not constitute multiple counts of fraud, as alleged in the September 8th letter. Moreover, the trial court did not make a finding that the expired food product was sold by C'est La Vie. Nor does the record contain any evidence that the appellants were being investigated by the U.S. Customs Office. Accordingly, the trial court erred when it concluded that the September 8th letter was substantially true in its stinging points. Under Caruso and Ward, the accusations of fraud contained in the September 8th letter were defamatory per se because they falsely imputed criminal conduct to the appellants.

2. April 22, 2000 letter
¶ 28 The appellants also allege that the trial court erred in finding that the April 22nd letter was not defamatory per se.[5]
¶ 29 At trial, Rostad and Marking testified regarding their concern about their reputation in the French vendor community, and of the importance of their attendance at the semi-annual Maison et Objet show. Rostad testified that the letter had an adverse affect because "vendors refuse to sell to us because of this letter, and we have also had vendors contact us that [sic] were very upset with the information contained within this letter." The evidence does not show, however, that *796 the letter had any actual, adverse affect upon Mais Oui!'s business. The appellants include a transcription of a letter from a vendor, L'Atelier Du Vin, to Maison de France, stating "[o]f course, since you are currently our client, we will not do business with Mais Oui!." But Rostad testified that Mais Oui! Would not have given L'Atelier Du Vin its business anyway, because Mais Oui! had "found a company that produces a better product." She also testified that Mais Oui! never tried to order from L'Atelier.
¶ 30 Similarly, another vendor, Alain Poujol, sent an e-mail to the Bouchards stating, "[w]e have received your letter of April 30th. Of course, since you are currently our client, we will not do business with Mais Oui!." There is no evidence that Mais Oui! desired to place orders with L'Atelier, or that it did so and was refused. Moreover, the record suggests that Maison de France had exclusivity agreements with these two vendors.
¶ 31 The record shows that two of the vendors that Mais Oui! wished to use, Idex and Crossings, were vendors used by Maison de France and were likely the recipients of the April 22nd letter. Mais Oui! placed an order with Crossings in April 2001 which Crossings refused to fill. Rostad testified that Mais Oui! had found an alternative source for the products it desired and was "no longer interested" in Crossings's products. Marking testified that Idex filled its September 2001 order, and that Mais Oui! never attempted to place any orders with Idex after that order was filled.
¶ 32 In contrast to the September 8th letter, the April 22nd letter lacks any allegation of criminal conduct. The letter misstates that Caroline Beaupere and Judith White worked for Mais Oui!, and mistates Mais Oui!'s street address, but these misstatements do not rise to the level of being defamatory. The letter also stated that the appellants had "been trying (using all available means) to obtain credit from our vendors including lying about their names and about the store for which they are working and their address." Based on the evidence, the trial court properly found that "a[t] the time that Exhibit 14 was sent Defendants had a reasonable belief that Plaintiffs had taken the concept and identity of Maison de France and used it to develop the competing store."

3. Letter to French-American Chamber of Commerce
¶ 33 The appellants contend that the September 6, 2001 letter which Coe sent to the executive director of the French-American Chamber of Commerce constitutes defamation.
¶ 34 The Coe letter stated:
September 6, 2001
...
Mr. Jack Cowan
Executive Director
French-American Chamber of Commerce of the Pacific Northwest
 2200 Alaskan Way
 Suite 490
 Seattle, WA 98121
Re: Maison de France, Ltd.
Dear Mr. Cowan:
I represent Maison de France, Ltc. ("Maison"). As you know, ....
The reason for this letter is that Maison is currently involved in litigation with a new company called Mais Oui!, a related entity called C'est la Vie!, and the founders Judith White, Nancee Rostad, Molly Marking, Caroline Beaupere, and their spouses. A true and correct copy of the Complaint filed with the King County Superior Court is attached hereto for your reference. This complaint accurately reflects Maison's claims against all parties. In short, Maison alleges that the founders that created these entities to compete with Maison, were all former employees of Maison. These former employees had access to Maison's confidential business plan, and without Maison's knowledge or consent, used that plan, in violation of the trade secret laws, to open their own competing businesses. One of the business locations is less than two blocks away.
While Maison acknowledges that competition is inevitable (and is aware that other stores also import similar items from France in the French Provincial style), Maison alleges that the ex-employees' blatant *797 theft of trade secrets developed by Maison is actionable under state law.
Maison respectfully urges the French-American Chamber of Commerce to deny membership and entry to Mais Oui!, C'est la Vie!, Judith White, Nancee Rostad, Molly Marking, Caroline Beaupere, and any entity affiliated with or related thereto. The alleged theft of trade secrets from Maison has been damaging to Maison's business. This denial of membership should be permanent. If the Chamber does not wish a permanent bar, then a temporary bar until all issues are resolved in civil litigation would be acceptable to Maison.
...
THE COE LAW GROUP, PLLC
JOHN A. COE
¶ 35 The trial court found that:
The letter from Mr. Coe accurately described the conflict between Mais Oui! and Maison de France and accurately set out the allegations that had been made in the pending litigation. The letter asked that Mais Oui! be denied membership in the Chamber. However, Mais Oui! was not denied membership and was permitted to participate in Chamber events. There is no credible evidence that anyone other than the director of the Chamber saw the letter or that any adverse consequences were experienced by Mais Oui! or the other Plaintiffs as a result of the letter.
In its oral findings, the trial court also relied upon Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), concluding that "[n]o liability for defamation exists based solely on the accurate reporting of the materials from judicial proceedings open to the public for inspection."
¶ 36 At trial, Marking testified that she was a member of the French-American Chamber of Commerce; the record thus supports the trial courts evidentiary finding that the Coe letter did not deter the Chamber of Commerce from admitting Marking as a member. Cox is also applicable to this case. Quoting the Restatement (Second) of Torts, s 652D Comment c, at 114, the Cox court stated:
"There is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public. Thus there is no liability for giving publicity to facts about the plaintiff's life which are matters of public record."
Because the Cox letter was written after the parties' litigation began, and the facts it recites were public knowledge, the trial court did not err in concluding that the letter did not constitute defamation.

B. Damages

1. Actual Damages
¶ 37 The trial court partially addressed the issue of damages, concluding that the appellants "failed to establish any economic damage, damage to reputation or emotional distress damages proximately caused by the Defendants' conduct." The record supports conclusion of law 2.5.3. C'est La Vie had never been a profitable business, it lost money on its first two shows, and had no plans for subsequent shows. The court had before it e-mails exchanged between White, Smith, and Rostad illustrating that the strife between the three partners was largely responsible for C'est La Vie's demise.[6] Rostad testified that she knew C'est La Vie would be unable to survive following her resignation and departure because she was the only one of the three partners who possessed the skills and contacts with French vendors critical to the company's survival. The court also found that "[a]t most, Terre e Provence, that particular vendor, did not sell their products to C [`est] L[a] V[ie], but there is no evidence that it was due to the conduct of the defendants." We note that there was no evidence showing that Terre e Provence cancelled its order from [C'est La Vie] in response to Bouchand's September 8th letter. The record contains sufficient evidence to support the trial court's finding that the appellants sustained no actual damages as a result of the September 8th letter.
*798 ¶ 38 Likewise, the appellants fail to show that the April 22nd letter constituted defamation per se or otherwise. Even if the assertions in this letter were false, the appellants have not met their burden of showing that the allegations about their names and representations about where they worked caused injury or damage. The record does not support a finding that the April 22nd letter exposed the appellants to hatred, contempt, ridicule or obloquy, deprived them of the benefit of public confidence or social intercourse, or injured them in their business, trade, profession or office. Caruso, 100 Wash.2d at 353, 670 P.2d 240. The record supports the trial court's conclusion that Mais Oui! sustained no actual damages as a result of the April 22nd letter. Therefore, we conclude that the trial court did not err in dismissing the appellants' claim against the respondents based on the April 22nd letter.

2. Presumed Damages
¶ 39 The appellants urge this court to adopt Dun & Bradstreet, Inc., v. Greenmoss Builders, Inc., 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), under which damages may be presumed in libel per se cases where the plaintiff is a private party and the issues are not of public concern, even in the absence of actual damages.
¶ 40 In Dun & Bradstreet, the Supreme Court narrowed the scope of Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, (1974). In Gertz, the plaintiff was a public figure. The Supreme Court held that when defamation derives from negligence, not actual malice, a plaintiff may recover only for actual damages. Gertz, 418 U.S. 323, 94 S.Ct. 2997. In contrast, the plaintiff in Dun & Bradstreet was a private figure and involved no issue of public concern. Dun & Bradstreet explained that, because the defendant in Gertz was a public figure, the interest in protecting expression found in the First Amendment was strong relative to the state's interest in compensating private individuals for injury to their reputation. Dun & Bradstreet, 472 U.S. at 757, 105 S.Ct. 2939. The balance of the two relative interests is altered when the plaintiff was a private individual, because "speech on matters of purely private concern is of less First Amendment concern." Dun & Bradstreet, 472 U.S. at 759, 105 S.Ct. 2939. Dun & Bradstreet held that when the defendant involved was not a public figure, "the state interest adequately supports awards of presumed and punitive damages-even absent a showing of `actual malice.'" Dun & Bradstreet, 472 U.S. at 761, 105 S.Ct. 2939.
¶ 41 Two Washington Court of Appeals cases have contemplated Dun & Bradstreet, but neither has expressly adopted its holding. In Vern Sims, the court found that the defendant's actions constituted actual malice. Vern Sims, 42 Wash.App. at 680-81, 713 P.2d 736. The Vern Sims court observed that Dun & Bradstreet:
held that a private individuals' recovery of presumed and punitive damages for defamation on a lesser showing than actual malice does not violate the First Amendment when the defamatory statements do not involve matters of public concern.
¶ 42 In Story v. Shelter Bay Company, 52 Wash.App. 334, 343, 760 P.2d 368 (1988), the court explained that "[t]he lessened protection Dun & Bradstreet affords communications made in private disputes has been recognized by Washington courts, but its holding on this issue has not been expressly adopted." Story, 52 Wash.App. at 346, 760 P.2d 368. Story declined to adopt Dun & Bradstreet because the parties had not briefed the issue at trial or on appeal. Story, 52 Wash.App. at 347, 760 P.2d 368.
¶ 43 Our Supreme Court has not expressly adopted Dun & Bradstreet. However, based on Washington case law prior to Gertz, under which presumed damages were permitted when defamation per se had been shown,[7] we believe that the Supreme Court will agree with our adoption of Dun & Bradstreet. We hold that under Dun & Bradstreet, where no matters of public concern are involved, presumed damages to a private plaintiff for defamation without proof of actual malice may be available.
*799 ¶ 44 In this case, the defendants' statement in the September 8th letter alleging that the appellants were the "object of an investigation by United States Customs, the FDA and the Seattle Police for multiple counts of fraud" constituted defamation per se. Therefore, while the trial court has found no economic or other actual damages, a finding we do not disturb, it must address the question of presumed damages. The trial court's discretion is to determine which presumed damages, either nominal or substantial, are awarded. We note that under no circumstances do our courts allow an award of punitive damages. Taskett v. KING Broadcasting Co., 86 Wash.2d 439, 447, 546 P.2d 81.

CONCLUSION
¶ 45 1) The statements in the September 22nd letter alleging that the appellants were being investigated for multiple counts of fraud constitute defamation per se. 2) We thus reverse the trial court on that issue. 3) We affirm the trial court's dismissal of the appellants' other claims of defamation. 4) We remand for findings consistent with this opinion, and for the trial court to exercise its discretion in the award of presumed damages.
¶ 46 Affirmed in part. Reversed in part and remanded.
KENNEDY and COLEMAN, JJ., concur.
NOTES
[1] "[I]t is the rule that defamatory words spoken of a person, which in themselves prejudice him in his profession, trade, vocation, or office, are slanderous and actionable per se unless they are either true or privileged." Waechter v. Carnation Co., 5 Wash.App. at 126, 485 P.2d 1000 (1971).
[2] The September 8th letter references C'est La Vie and the individual appellants, but not Mais Oui!.
[3] The parties do not dispute that Rostad, White, and Beaupere were not authorized to act for Maison de France at the time of the September 8, 2000 letter.
[4] The record does not indicate, nor do the appellants brief, whether or not Bouchand fired Caroline Beaupere, although it is clear that Beaupere no longer worked for Maison de France. We do not address assignments of error or claims unsupported by argument or citations to the record. RAP 10.3; In re Matter of Estate of Lint, 135 Wash.2d 518, 532, 957 P.2d 755 (1998).
[5] The April 22nd letter did not mention C'est La Vie, but did mention Mais Oui! and individual appellants.
[6] The e-mails are not a part of the record on this appeal.
[7] See, e.g., Waechter v. Carnation Co., 5 Wash.App. 121, 126, 485 P.2d 1000 (1971); Spangler v. Glover, 50 Wash.2d 473, 478, 313 P.2d 354 (1957).