IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| LIFE DESIGNS RANCH, INC., a Washington Corporation, VINCENT BARRANCO, an individual, and BOBBIE BARRANCO, an indidivual, | ) ) ) ) ) | No. 32922-4-III |
| Appellants, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| MICHAEL SOMMER, | ) ) | |
| Respondent. | ) | |

BROWN, A.C.J. — Life Designs Ranch (Life Designs) appeals the summary judgment dismissal of its defamation, tortious interference with a business expectancy, and invasion of privacy (false light) claims against Michael Sommer. Life Designs contends the trial court erred when it concluded Life Designs had failed to establish its legal claims as a matter of law. We disagree with Life Designs and affirm.

FACTS

Life Designs, owned by Vince and Bonnie Barranco, is a substance abuse aftercare program for young adults operating from Cusick, Washington with following optional transition housing in Spokane. Clients attend Narcotics Anonymous/Alcoholics Anonymous meetings at off-site locations three times a week as part of the program.

The six-month Cusick program costs clients $52,200 plus a $1,200 initial interview fee. The Spokane transitional program costs an additional $12,000.

Clay Garrett, formerly Life Designs' admissions director, developed relationships with educational consultants hired by the families of prospective clients to guide them in program selection. The educational consultants typically narrow the prospective client's focus to three recommended programs. Mr. Garrett updated Life Designs' website to attract more clients. He often gave educational consultants and prospective clients Life Designs' website information so they could learn more about the program.

In 2012, Mr. Sommer contracted to send his son to Life Designs. Mr. Sommer later disputed Life Designs' billings. Mr. Sommer e-mailed Mr. Barranco:

> Please review your contract again. It specifically states that any partial months are billed at full and the last month is not refundable. I think you are in a highly indefensible position. The 26K was put into brackets to show that was the amount we were at THE MOST liable for, not the least. I am willing to get legal with this. Are you? I would hope that the most important thing to you is your reputation. We all know how easily reputations can be destroyed, without the legal system even getting involved. But I would go both routes if I have to. You are wrong on all fronts. Please reconsider before we find it necessary to proceed.

Clerk's Papers (CP) at 257.

Mr. Sommer contacted one of Life Designs' referral sources, Chad Balagna, who worked at a preliminary treatment program. According to Mr. Sommer, he told Mr. Balagna he should "reconsider if he was going to recommend people there so his own reputation would be protected." CP at 243. It is unclear if Mr. Balagna is considered an educational consultant. Additionally, Mr. Sommer unsuccessfully complained to the

2

Better Business Bureau. He registered www.lifedesignsranchinc.com, a domain name similar to Life Designs' actual domain name, www.lifedesignsinc.com, Mr. Sommer uploaded and published allegedly defamatory content onto his website, partly including:

- The problems with this organization are numerous. Life Designs Ranch claims to help you pursue your life's passions. That is only true if your life passion fits into what the other 11 prisoners and their wardens consider their life passion.
- Therapeutic environment??? Only for the staff and the owner, Vince Barranco, who finds that charging 12 young adults $8000 to $9000 a months for food and housing permits him to pursue his life passions since he really doesn't have to work and has free labor to increase the value of his property.
- **What you get** . . . A visual experience of pine trees, dead pine trees, falling down pine trees, disintegrated pine trees, and more pine trees. River, can't be seen. Mountains, can't be seen. Civilization, can't be seen. But there are pine trees!!!!!
- **What you get** . . . 2 or 3 twelve step meetings a week in a very small western Washington community where the only young adults in attendance are those from Life Designs ranch.
- **You should go to Life Designs if:** . . . You believe that it takes no education or experience with substance abuse, or compassion for the young adult who is recovering from a substance addiction to help them become the person they want to be.

CP at 248-51. The "About Us" section on Mr. Sommer's website partly specified:

"We are here to try to protect people from the financial and emotional distress that comes with attending Life Designs Ranch." CP at 251. It concluded:

"Healing is not done and *seems* to be very limited in it's [sic] attempt. Keep your money, go somewhere else . . . ." *Id.* (emphasis added). The website also included a link to Human Earth Animal Liberation's (HEAL) preexisting website alleging Life Designs is run like a cult, illegally exploits student labor, and employs a staff member who worked at another camp when a young boy died.

3

Life Designs sued Mr. Sommer for defamation, intrusion, false light, and interference with business expectancy based on later business losses. After the trial court dismissed its claims at summary judgment, Life Designs appealed.

STANDARD OF REVIEW

We review summary judgment orders de novo, engaging in the same inquiry as the trial court. *Mohr v. Grant*, 153 Wn.2d 812, 821, 108 P.3d 768 (2005). Summary judgment is appropriate if the evidence, when viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact remains and the moving party is entitled to judgment as a matter of law. CR 56(c). "[C]onstruing the evidence in the light most favorable to the nonmoving party, the court asks whether a reasonable jury could find in favor of that party." *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 767-68, 776 P.2d 98 (1989). In defamation cases, summary judgment plays an important role: "Serious problems regarding the exercise of free speech and free press guaranteed by the First Amendment are raised if unwarranted lawsuits are allowed to proceed to trial. The chilling effect of the pendency of such litigation can itself be sufficient to curtail the exercise of these freedoms." *Mark v. Seattle Times*, 96 Wn.2d 473, 485, 635 P.2d 1081 (1981) (internal quotation marks omitted).

4

## ANALYSIS

### A. Defamation Per Se

The issue is whether the trial court erred in failing to find, as a matter of law, Mr. Sommer's website was defamatory per se. Life Designs contends reasonable minds could solely conclude the false content on Mr. Sommer's website exposed it to hatred, contempt, ridicule, and obloquy, deprived it of public confidence, and injured its business.

"Whether a given communication constitutes defamation per se may be either a question of law or a question of fact." *Maison de France, Ltd. v. Mais Oui!, Inc.*, 126 Wn. App. 34, 43, 108 P.3d 787 (2005). A publication is defamatory per se (actionable without proof of special damages) if it "(1) exposes a living person to hatred, contempt, ridicule or obloquy, or to deprive him of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office." *Caruso v. Local Union No. 690*, 100 Wn.2d 343, 353, 670 P.2d 240 (1983). A jury normally decides what is defamatory per se:

> Where the definition of what is libelous *per se* goes far beyond the specifics of a charge of crime, or of unchastity in a woman, into the more nebulous area of what exposes a person to hatred, contempt, ridicule or obloquy, or deprives him of public confidence or social intercourse, the matter of what constitutes libel *per se* becomes, in many instances, a question of fact for the jury.

*Id.* at 354 (quotation marks omitted).

Life Designs argues Mr. Sommer's website directly attacks its recovery program business by denigrating its therapeutic environment and the staff's education,

5

experience, and compassion. But the website statements do not rise to the level of "extreme" need to constitute defamation per se as a matter of law. The criticized statements are similar to those seen in *Caruso*, dealing with "the rather vague areas of public confidence, injury to business, etc." *Id.* at 353.

In *Caruso*, an article was printed in a weekly paper mailed to union members. *Id.* at 346. The article urged readers to avoid patronizing a carpet business because the business harassed laborers who, due to construction, parked at the business to make deliveries nearby. *Id.* The article further explained despite the laborers' willingness to move the equipment, the business still impounded the equipment. *Id.* This article was printed four times. *Id.* at 346-47. After its publication, people called the business, telling the owner they would not shop there. *Id.* at 347. Other callers used various derogatory and profane terms to refer to the owner. *Id.* Sales dropped sharply. *Id.* The court held the trial court improperly instructed the jury when it told the jury if the jury found the article was false and defamatory it was libelous per se. *Id.* at 353-54. Whether the article was defamatory per se was for the jury to decide. *Id.*

Similarly, Mr. Sommer's website warned potential clients away from Life Designs. Life Designs' business declined shortly after publication. But unlike in *Caruso*, there were no threatening phone calls nor were there calls where people said they would not send their family member/client to Life Designs. Given *Caruso*, we conclude the less severe publication here cannot be defamation per se as a matter of law.

6

## B. Defamation

The issue is whether the trial court erred in dismissing Life Designs' defamation claim. Life Designs contends: (1) the contents of Mr. Sommer's website are actionable statements of false fact resulting in damage to Life Designs and (2) Mr. Sommer republished allegedly defamatory material by hyperlinking the HEAL website.

Life Designs must raise a genuine issue of material fact as to the four elements of a prima facie defamation claim by establishing: (1) Mr. Sommer's statements were false, (2) the statements were unprivileged, (3) Mr. Sommer was at fault, and (4) the statements proximately caused damages. *Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*, 114 Wn. App. 371, 378, 57 P.3d 1178 (2002). Here, elements (1) and (4) are contested. "The prima facie case must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists." *Id.* (internal quotation marks omitted).

The alleged defamatory statement must be a statement of fact, not a statement of opinion. *Davis v. Fred's Appliance, Inc.*, 171 Wn. App. 348, 365, 287 P.3d 51 (2012). As the line between fact and opinion "is sometimes blurry," we consider the following factors to determine whether a statement is actionable: "'(1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts.'" *Id.* (quoting *Dunlap v. Wayne*, 105 Wn.2d 529, 539, 716 P.2d 842 (1986)). Regarding the first factor, the *Dunlap* court

7

noted statements expressing opinion are found more often in certain contexts. *Dunlap*, 105 Wn.2d at 539. "The court should consider the entire communication and note whether the speaker qualified the defamatory statement with cautionary terms of apparency." *Id.* (internal quotation marks omitted).

All allegedly defamatory statements were published on Mr. Sommer's website, the medium. In this realm, a dearth of Washington defamation law exists. While other jurisdictions have found statements on similar "spoof" websites can survive a motion for summary judgment or a motion to dismiss, no case has held the existence of such a "spoof" website automatically means the statements on the website are actionable. *See Taylor Bldg. Corp. of Am. v. Benfield*, 507 F. Supp. 2d 832, 838-40 (S.D. Ohio 2007) (individually analyzing statements on a "spoof" website to determine whether they are actionable); *Winer v. Senior Living Guide, Inc.*, No. 12-934, 2013 WL 1217582 (W.D. Pa. 2013) (denying motion to dismiss where the "spoof" website contained untrue factual statements and falsely indicated it was the plaintiff's official website).

Mr. Sommer did not attempt to pass his website off as Life Designs' official website; the "About Us" section is clear, using "seems" as a word of apparency. *Dunlap*, 105 Wn.2d at 539; CP at 251. Thus the website suggested opinions, not facts. Furthermore, Mr. Sommer's website did provide a hyperlink to Life Designs' official website and expressly said that the link was to "the website for Life Designs Ranch." CP at 250. From a policy standpoint, allowing businesses to sue any unhappy consumer for what they posted online for defamation would stifle freedom of speech.

8

The internet is a medium where statements expressing opinions in the context of reviewing businesses and services are often found. The medium and context of Mr. Sommer's website denotes it is opining about the quality of Life Designs' business, especially when looked at in relation to the other two factors discussed next.

For the second factor, courts should consider "whether the audience expected the speaker to use exaggeration, rhetoric, or hyperbole." *Dunlap*, 105 Wn.2d at 539. Here, the audience was the people researching Life Designs. Online search engines retrieved many results for Life Designs; the first result was Life Designs' official website, the fourth result was Mr. Sommer's website, and the fifth result was the HEAL website. The blurb describing Mr. Sommer's website read, "Thinking about going to or sending someone you love to Life Designs Ranch?? Read this first." CP at 60. This language signaled this was a review and not the official website of Life Designs.

The third factor is "perhaps [the] most crucial" as "[a]rguments for actionability disappear when the audience members know the facts underlying an assertion and can judge the truthfulness of the allegedly defamatory statements themselves." *Dunlap*, 105 Wn.2d at 539-40; *see Davis*, 171 Wn. App. at 366 (stating the third factor "addresses whether a listener unknown to the plaintiff can judge the truthfulness of the statement"). "Whether a statement is one of fact or opinion is a question of law unless the statement could only be characterized as either fact or opinion." *Davis*, 171 Wn. App. at 365. Life Designs discusses three statements in its briefing.

9

The first criticized statement is: "**What you get** . . . . 2 or 3 twelve step meetings a week in a very small western Washington community where the only young adults in attendance are those from Life Designs ranch." CP at 248. While Mr. Sommer incorrectly described Life Designs as being located in western Washington, this statement was not based on undisclosed facts. Rather, Life Designs' official website states it is located in Cusick, Washington, which is on the eastern side of the state.

The second statement, "**What you get** . . . . A visual experience of pine trees, dead pine trees, falling down pine trees, disintegrated pine trees, and more pine trees. River, can't be seen. Mountains, can't be seen. Civilization, can't be seen. But there are pine trees!!!!!" CP at 248. On its website, Life Designs disclosed it is located "on 30 acres overlooking the Pend O'reille River on the international Selkirk Scenic Loop" and the "area boasts a reputation for one of the most undiscovered recreational areas in the northwest." Life Designs Ranch, http://www.lifedesignsinc.com (last visited Sept. 9, 2015). The website shows pictures of clients in Life Designs' natural setting. *Id.*

The third statement is "**Who Should Go? You should go to Life Designs if:** . . . You believe that it takes no education or experience with substance abuse, or compassion for the young adult who is recovering from a substance addiction to help them become the person they want to be." CP at 249. Again, this statement is based on disclosed facts. Life Designs' website discusses the experience and education of its staff. While the compassion of the staff is not directly addressed on Life Designs' website, compassion is a subjective determination and is thus opinion.

10

Each *Dunlap* factor weighs in Mr. Sommer's favor. Given all, Mr. Sommer's statements were nonactionable as defamation. Even if actionable, Life Designs fails to make a sufficient showing Mr. Sommer's statements proximately caused its damages.[1]

The sparse evidence shows (1) a decline in referrals following publication of Mr. Sommer's website despite an increase in traffic to Life Designs' official website, (2) some hearsay by Mr. Garrett about an interaction between Mr. Sommer and Mr. Balagna regarding not making referrals to Life Designs, and (3) no other apparent changes accounting for the referral decline. Mr. Garrett's declaration opining Mr. Sommer's website caused the decline in referrals is conclusory. Mr. Garrett limited his analysis to Life Designs' official website. No evidence shows anyone who visited Life Designs' website visited or was influenced by Mr. Sommer's website. Life Designs has

---

[1] Mr. Sommer contends Mr. Garrett's declaration is inadmissible as an expert opinion because (1) Mr. Garrett was not qualified to offer the opinions contained therein, thus (2) much of the declaration was inadmissible conclusory allegations of a lay witness. We cannot consider inadmissible evidence when ruling on a motion for summary judgment. *Davis*, 171 Wn. App. at 357. We review the admissibility of evidence in summary judgment proceedings de novo. *Id.* ER 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Under this rule, we engage in a two-part inquiry: "(1) does the witness qualify as an expert; and (2) would the witness's testimony be helpful to the trier of fact." *State v. Guillot*, 106 Wn. App. 355, 363, 22 P.3d 1266 (2001). The focus of our inquiry is on Mr. Garrett's qualifications. "[I]n the appropriate context, practical experience is sufficient to qualify a witness as an expert." *State v. McPherson*, 111 Wn. App. 747, 762, 46 P.3d 284 (2002) (internal quotation marks omitted). Once a witness is qualified as an expert, any deficiencies in that qualification go to the weight, not the admissibility of the testimony. *Keegan v. Grant County Pub. Util. Dist. No. 2*, 34 Wn. App. 274, 283, 661 P.2d 146 (1983). Mr. Garrett's experience in wilderness programs, computers (including building a website), and business development render his testimony

not referred to or produced anyone who did not choose Life Designs because of Mr. Sommer's website. And while Life Designs can show Mr. Sommer talked to Mr. Balagna about not referring anyone to Life Designs, no evidence shows Mr. Balagna took Mr. Sommer's advice and stopped referring clients.

Mr. Sommer argues coincidence is not proof of causation. *See Anica v. Wal-Mart Stores, Inc.*, 120 Wn. App. 481, 489, 84 P.3d 1231 (2004) (stating employee's argument that timing of her termination gave rise to a reasonable inference of unlawful discrimination relied on a logical fallacy—"after this, therefore because of this"). Life Designs cites to *Borden v. City of Olympia*, 113 Wn. App. 359, 53 P.3d 1020 (2002), to show coincidence in timing can give rise to an inference the result was the proximate cause of the action. There are two defects in Life Designs' analogy. First, *Borden* was not a defamation case. In defamation cases, it has been held in a summary judgment context, absent a privileged defendant, a private individual must prove negligence by a preponderance of the evidence. *Momah v. Bharti*, 144 Wn. App. 731, 742, 182 P.3d 455 (2008); *see Mohr*, 153 Wn.2d at 822. Second, the evidence used regarding coincidence in timing was quite different. In *Borden*, flooding started the first winter after the drainage project was completed and recurred each winter for several years. *Borden*, 113 Wn. App. at 372. The flooding subsided when another drainage facility channelled water out of the area. *Id.* The evidence submitted by Life Designs does not meet the preponderance of the evidence standard.

---

admissible under ER 702. Any deficiencies in his testimony thus would go to the weight.

Next, Life Designs contends publishing the hyperlink to an allegedly defamatory website alone constitutes republication of that defamatory content to third persons reading Mr. Sommer's website. No Washington case addresses this contention.

Washington has adopted the single publication rule which "states that any one edition of a book or newspaper, or any one radio or television broadcast, is a single publication." *Momah*, 144 Wn. App. at 752 (internal quotation marks omitted). *Momah* is the sole Washington case exploring application of this rule to the internet. There, a newspaper published comments attributed to the defendant. *Id.* at 737. Another article was later published, again quoting the defendant. *Id.* At some point, the defendant posted the newspaper articles to his website. *Id.* In holding the defendant republished the defamatory material, the court reiterated "the general rule that each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises." *Id.* at 753 (internal quotation marks omitted). The court held the defendant made the statement two different times, once when he spoke to the newspaper and once when he posted the articles on his website. *Id.* The two publications were aimed at different audiences. *Id.* The court found the situation did not differ from a newscast reading the same copy at 5:30 p.m. and 11:00 p.m. *Id.*

While no Washington law is directly on point, a federal court grappling with this same issue used Washington law to hold "a mere reference or URL [Uniform Resource Locator] is not a publication of the contents of the materials referred to." *U.S. ex. rel.*

*Klein v. Omeros Corp.*, 897 F. Supp. 2d 1058, 1074 (W.D. Wash. 2012). The *Klein* court distinguished relevant Washington case law, including *Momah*, by stating "a finding of republication hinged on the defendant's communication of the *contents* of the original, allegedly defamatory statements." *Id.* Because the defendant in *Klein* merely provided a URL to such statements, no republication of the contents existed. *Id.*

Other courts considering the issue are in accord with *Klein*. In *Salyer v. S. Poverty Law Center, Inc.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009), the court observed:

> It appears that the common thread of traditional republication is that it presents the material, in its entirety, before a new audience. A mere reference to a previously published article does not do that. While it may call the *existence* of the article to the attention of a new audience, it does not present the *defamatory contents* of the article to that audience. Therefore, a reference, without more, is not properly a republication.

Because a hyperlink is more like a reference than a separate publication, "[m]aking access to the referenced article easier does not appear to warrant a different conclusion from the analysis of a basic reference." *Id.* at 917; *see also In re Philadelphia Newspapers*, 690 F.3d 161, 175 (3d Cir. 2012) (holding "though a link and reference may bring readers' attention to the existence of an article, they do not republish the article").

We are persuaded by *Klein* and *Salyer*. We reason a URL is not qualitatively different from a mere reference. Therefore, we hold Mr. Sommer did not republish allegedly defamatory material when he posted on his website: "For more info click or cut and paste the link below http://www.heal-online.org/lifedesigns.htm." CP at 249.

14

C. Tortious Interference with a Business Expectancy

The issue is whether the trial court erred in dismissing Life Designs' claim for tortious interference with a business expectancy. The five elements of a tortious interference with a business expectancy are: "(1) the existence of a valid . . . business expectancy; (2) that defendants had knowledge of that [expectancy]; (3) an intentional interference inducing or causing a breach or termination of the . . . expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage." *Leingang v. Pierce County Med. Bureau*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997). The first, third, fourth, and fifth elements are at issue here.

"A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value." *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 114 Wn. App. 151, 158, 52 P.3d 30 (2002). A plaintiff must show future business opportunities "are a reasonable expectation and not merely wishful thinking," but certainty of proof is not needed. *Caruso v. Local Union No. 690*, 33 Wn. App. 201, 208, 653 P.2d 638 (1982), *rev'd on other grounds*, 100 Wn.2d 343 (1983). Life Designs used its historical referral and enrollment records to demonstrate it could reasonably (1) expect a certain number of referrals each quarter and (2) successfully enroll a specific percentage of those referrals as clients. Thus, Life Designs raised a prima facie business expectancy.

Next, interference with a business expectancy is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to

15

occur as a result of his action." *Newton Ins. Agency & Brokerage, Inc.*, 114 Wn. App. at 158 (internal quotation marks omitted). Looking at the evidence in the light most favorable to Life Designs, Mr. Sommer intentionally interfered with a business expectancy. Mr. Sommer acquired a domain name similar to that of Life Designs' official website because he wanted people to see his website when searching for Life Designs. Mr. Sommer wanted people to research and question Life Designs' program. Mr. Sommer admitted telling Mr. Balagna he should not refer clients to Life Designs.

In evaluating the fourth element, a plaintiff must establish the intentional interference was wrongful. *Pleas v. City of Seattle*, 112 Wn.2d 794, 804, 774 P.2d 1158 (1989). Interference is wrongful if it is done for an improper purpose or by improper means. *Id.* In *Pleas*, the city of Seattle intentionally stalled development of a high-rise apartment complex. The improper motive was a desire to curry favor with the active and influential opponents of the project; the improper means was the city's arbitrary refusal to grant necessary permits. *Id.* at 804-05. The means used by Mr. Sommer, the internet website, was not improper. But looking at the evidence in the light most favorable to Life Designs, a genuine issue of material fact exists as to whether Mr. Sommer acted with an improper purpose as he threatened to destroy Life Designs' reputation in an e-mail.

Decisive is the fifth element. Life Designs fails to show resultant damage to its business expectancy. The trial court did not err in dismissing this claim because Life Designs' conclusory claim of injury to reputation lacks evidentiary support. No client,

16

potential client, or referral source submitted an affidavit establishing they can no longer trust Life Designs or did not choose Life Designs because of Mr. Sommer's website.

### D. False Light

The issue is whether the trial court erred in dismissing Life Designs' false light claim. Life Designs contends Mr. Sommer's website placed the Barrancos in a false light because the contents of the website created a false impression about the way in which the Barrancos operated their business.

"The protectable interest in privacy is generally held to involve four distinct types of invasion: intrusion, disclosure, false light and appropriation." *Eastwood v. Cascade Broad. Co.*, 106 Wn.2d 466, 469, 722 P.2d 1295 (1986) (internal quotation marks omitted). Actions based on invasion of privacy are separate and distinct from those based on defamation. *Id.* False light claims differ from defamation claims because false light claims focus on compensation for mental suffering rather than reputation. *Id.* at 471. Washington follows the *Restatement (Second) of Torts. Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 135, 580 P.2d 246 (1978) (establishing the RESTATEMENT (SECOND) OF TORTS § 652D (1977) sets out the guiding principles for invasion of privacy actions).

Only a living individual whose privacy has been invaded can maintain an action for invasion of privacy. RESTATEMENT (SECOND) OF TORTS § 652I. Comment (c) to the *Restatement* states a corporation has no personal right of privacy and thus has no cause of action for invasion of privacy. Thus, Life Designs' false light claim fails. But the Barrancos individually sued for false light and do not face the corporate exclusion.

17

> A false light claim arises when someone publicizes a matter that places another in a false light if (a) the false light would be highly offensive to a reasonable person and (b) the actor knew of or recklessly disregarded the falsity of the publication and the false light in which the other would be placed.

*Eastwood*, 106 Wn.2d at 470-71 (internal quotation marks omitted). While the Barrancos' false light claim may have merit, all evidence in relation to damages is in reference to Life Designs. Ms. Barranco was not mentioned by name on Mr. Sommer's website; her claim is derivative of Mr. Barranco's claim. Mr. Barranco did not state he personally suffered damage to his reputation or any emotional suffering; rather, all his statements refer to the damages suffered by his business, Life Designs. Thus, the trial court did not err in dismissing the false light claims.

Affirmed.

Brown, A.C.J.

I CONCUR:

Korsmo, J.

No. 32922-4-III

FEARING, J. (concurring in part and dissenting in part) — I conclude that plaintiff

Life Designs Ranch, Inc. (Life Designs) presents sufficient facts to survive a summary

judgment motion on its claims of defamation and tortious interference with business

expectancy. Thus, I, in part, respectfully dissent from the majority. I concur with the

majority's ruling that Life Designs may not recover against Michael Sommer because of

a hyperlink on his website to another site critical of Life Designs. I also concur that Life

Designs and Vincent and Bobbie Barranco cannot recover in false light.

The majority commits three fundamental errors that lead to my partial dissent.

First, the majority mistakenly fabricates a new element of "extreme defamation" for

defamation per se. Second, the majority mistakenly levies a higher standard of proof, not

imposed in other actions, for causation in defamation and tortious interference with

business expectancy actions. Third, the majority also weighs facts on the issue of

damages.

The majority retells the basic facts of the dispute. The facts include quotes of the

alleged defamatory statements published by defendant Michael Sommer about Life

Designs. I will emphasize some of the basic facts when I discuss the respective claims asserted by Life Designs.

## DEFAMATION PER SE

I do not know if defamation per se is a cause of action distinct from defamation, but I analyze the former separately from the latter. Life Designs does not allege defamation per se as a separate cause of action but has consistently argued defamation per se as a basis for recovery. Defamation per se loosens for the plaintiff the burden of proving damages. If a plaintiff shows defamation per se, the law presumes damages. *Maison de France, Ltd. v. Mais Oui!, Inc.*, 126 Wn. App. 34, 53-54, 108 P.3d 787 (2005). Stated differently, plaintiff need not prove loss of income or special damages to recover. Since the trial court dismissed Life Designs' defamation claim because of a failure to show damages, whether Life Designs creates an issue of fact as to defamation per se looms important. To intelligently analyze defamation per se, I must first include a discussion of the elements of defamation.

The common law distinguished between libel, written or printed defamatory words, and slander, spoken defamatory words. Washington no longer distinguishes between libel and slander, such that Washington law only recognizes a cause of action for defamation.

The law of defamation embodies the public policy that individuals should be free to enjoy their reputations unimpaired by false and defamatory attacks. *Maressa v. New*

2

*Jersey Monthly*, 89 N.J. 176, 445 A.2d 376, 383 (1982); *Campos v. Oldsmobile Div., Gen. Motors Corp.*, 71 Mich. App. 23, 246 N.W.2d 352, 354 (1976); 50 Am. Jur. 2d *Libel and Slander* § 2 (2015). Decisions of the United States Supreme Court recognize the important societal interest in the protection of individual reputations, despite First Amendment protections for free speech. *Herbert v. Lando*, 441 U.S. 153, 169, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979); *N.Y. Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). Defamation is an impairment of a relational interest; it denigrates the opinion which others in the community have of the plaintiff and invades the plaintiff's interest in his or her reputation and good name. *Lumbermen's Mut. Cas. Co. v. United Services Auto Ass'n*, 218 N.J. Super. 492, 528 A.2d 64, 67 (App. Div. 1987); 50 Am. Jur. 2d *Libel and Slander* § 2 (2015). One's reputation can greatly impact one's business and income. Washington courts generally deny that the state's civil law seeks to punish, but one Supreme Court decision exclaimed that the purpose of defamation law is to punish the publisher, since there is no constitutional protection for a false, damaging statement. *Duc Tan v. Le*, 177 Wn.2d 649, 666, 300 P.3d 356 (2013).

Washington decisions characterize defamation as consisting of four elements: (1) a false statement, (2) publication, (3) fault, and (4) damages. *Duc Tan v. Le*, 177 Wn.2d at 662 (2013); *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 768, 776 P.2d 98 (1989). Some cases substitute the element of unprivileged communication for publication. *Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 767, 320 P.3d 77 (2013), *review*

3

*denied*, 180 Wn. 2d 1026, 328 P.3d 903 (2014); *Demopolis v. Peoples Nat'l Bank of Wash.*, 59 Wn. App. 105, 108, 796 P.2d 426 (1990). The traditional four elements can be dissected into a lengthier list that includes:

1. a statement;
2. factual in character rather than an opinion;
3. defamatory in nature;
4. and false;
5. concerning the plaintiff;
6. communicated to a third party;
7. without an absolute or conditional privilege to so communicate;
8. with a varying degree of fault on the part of the defendant depending on the nature of the plaintiff and the statement;
9. and which causes;
10. damages.

Former Court of Appeals Judge Dean Morgan wrote an opinion in *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 943 P.2d 350 (1997), in the nature of a law review article, that meticulously explains the history behind the defamation action and the permutations in its elements.

I return to defamation per se. Michael Sommer contends that defamation per se applies solely to statements accusing the plaintiff of unchaste or criminal conduct. Sommer cites *Davis v. Fred's Appliance, Inc.*, 171 Wn. App. 348, 367, 287 P.3d 51, 61 (2012) for this proposition. *Davis* at page 367 does read that: "defamation per se *generally* requires imputation of a crime or communicable disease." (Emphasis added). The quotation does not read that defamation per se always necessitates attribution of crime or communicable disease. *Davis* cites a Florida and an Ohio case for its

4

proposition.

No Washington decision expressly limits defamation per se to crime and infectious disease. Instead, oodles of decisions extend defamation per se well beyond accusations of disease and criminal behavior. A statement is defamatory per se if it (1) exposes a living person to hatred, contempt, ridicule or obloquy, or to deprive him of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office. *Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters*, 100 Wn.2d 343, 353, 670 P.2d 240 (1983); *Amsbury v. Cowles Publ'g Co.*, 76 Wn.2d 733, 737, 458 P.2d 882 (1969); *Grayson v. Curtis Publ'g Co.*, 72 Wn.2d 999, 436 P.2d 756 (1967); *Purvis v. Bremer's, Inc.*, 54 Wn.2d 743, 751, 344 P.2d 705 (1959); *Spangler v. Glover*, 50 Wn.2d 473, 313 P.2d 354 (1957); *Wood v. Battle Ground Sch. Dist.*, 107 Wn. App. 550, 573-74, 27 P.3d 1208 (2001); *Maison de France, Ltd. v. Mais Oui!, Inc.*, 126 Wn. App. 34 (2005); *Haueter v. Cowles Publ'g Co.*, 61 Wn. App. 572, 578, 811 P.2d 231 (1991); *Vern Sims Ford, Inc. v. Hagel*, 42 Wn. App. 675, 679, 713 P.2d 736 (1986); *Corbin v. Madison*, 12 Wn. App. 318, 529 P.2d 1145 (1974). Defamatory words spoken of a person, which themselves prejudice him in his profession, trade, vocation, or office, are slanderous and actionable per se. *Ward v. Painters' Local Union No. 300*, 41 Wn.2d 859, 863, 252 P.2d 253 (1953); *Maison de France, Ltd. v. Mais Oui!, Inc.*, 126 Wn. App. at 45 n.1 (2005); *Waechter v. Carnation Co.*, 5 Wn. App. 121, 126, 485 P.2d 1000 (1971). A publication is also defamatory per se if it imputes to the plaintiff conduct

5

involving moral turpitude. *Maison de France, Ltd. v. Mais Oui!, Inc.*, 126 Wn. App. 34 (2005); *Ward v. Painters' Local Union No. 300*, 41 Wn.2d at 863.

The list of categories mentioned by Washington courts as comprising defamation per se may cover all defamatory statements such that all defamatory statements could be judged defamation per se, particularly since the object behind the tort is to protect one's public confidence and the goal of the tort is to guard one's personality from contempt and ridicule. I need not explore the limits, however, of defamation per se, since facts support a conclusion that Michael Sommer's website deprived Life Designs of the benefit of public confidence and injured the business and trade of the addiction recovery center.

The majority impliedly holds that a defamatory statement must be "extreme" in order to qualify as defamatory per se. Majority Op. at 6. No Washington decision supports this holding. The adjective "extreme" arises from our high court's decision in *Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters*. The Supreme Court wrote:

> The imputation of a criminal offense involving moral turpitude has been held to be clearly libelous per se. [*Ward v. Painters' Local 300*], 41 Wn.2d 859, 252 P.2d 253 (1953). The instant case is quite different. It deals with the rather vague areas of public confidence, injury to business, etc. In such cases
>
>> Where the definition of what is libelous *per se* goes far beyond the specifics of a charge of crime, or of unchastity in a woman, into the more nebulous area of what exposes a person to hatred, contempt, ridicule or obloquy, or deprives him of public confidence or social intercourse, the matter of what constitutes libel *per se* becomes, in many instances, a question of fact for the jury.

6

> *Purvis v. Bremer's, Inc.*, 54 Wn.2d 743, 752, 344 P.2d 705 (1959). In all
> but *extreme cases* the jury should determine whether the article was
> libelous per se. *Miller v. Argus Publ'g Co.*, 79 Wn.2d 816, 820 n.3, 821
> n.4, 490 P.2d 101 (1971); *Amsbury v. Cowles Publ'g Co.*, *supra* [76 Wn.2d
> at 740].

*Caruso v. Local Union*, 100 Wn.2d at 353-54. (Emphasis added). Note that the quotation demands that the jury determine whether a statement is defamatory per se except in extreme cases. The excerpt does not command an extreme case before a judge or jury may declare the statement defamatory per se. Later decisions read the *Caruso* quote as declaring that a determination of whether a statement is defamatory per se is for the court, not the jury, unless the claim involves the vague areas of public confidence or injury to business. *Wood v. Battle Ground Sch. Dist.*, 107 Wn. App. at 574 (2001). Life Designs does not seek a ruling on appeal as a matter of law that Michael Sommer's website constituted defamation per se. Life Designs settles for sending the claim of defamation per se to a jury.

The majority's holding that only "extreme" cases qualify for defamation per se will create difficulties for practitioners and lower courts. The majority gives little, if any, guidance, as to what circumstances qualify as "extreme" cases. Lawyers and trial courts may wonder if they look to principles adopted in intentional infliction of emotional distress decisions to determine when conduct of a defendant constitutes outrage. In such a setting, the plaintiff must establish "extreme" conduct. *Trujillo v. Nw. Trustee Servs., Inc.*, 183 Wn.2d 820, 840, 355 P.3d 1100 (2015).

7

In *Caruso v. Local Union*, the defendant union published a "do not patronize"

article in its weekly paper. The article read:

> Don't [P]atronize Carpet City in Spokane
> This is to notify all members of Teamsters Union, Local 690 and all other Teamsters and Laboring people in the State of Washington that when traveling to and from the Expo City—"please do not *patronize Carpet City Carpet & Linoleum Shop* at West 518 Main Avenue"—Spokane, Washington," [sic] (Expo City). The reasons for this request are: This Company is continuously harassing the Teamsters and other laboring people who may at some time use the parking facility at this place of business to make a delivery because of the congested traffic problems in Expo City since construction is going on mainly in that area. Someone from this Company removes the keys of such vehicles, have [*sic*] the equipment impounded and create [*sic*] many problems for these employees and their employers including the cost of impoundment to those effected [sic].
> This company will not cooperate with these drivers when told that they will move their equipment and apologize for parking in this area—their equipment is still impounded!
> We request that all Laboring people—Teamsters or otherwise—*do not [p]atronize Carpet City Carpet & Linoleum Shop.*
> Thanks kindly for your *Support.*
> Teamsters Union, Local 690.

*Caruso*, 100 Wn.2d at 346. Facts belied the allegations regarding the carpet business'

lack of cooperation and impoundment of vehicles after an apology. Contrary to this

court's majority's analysis, the *Caruso* court did not declare a jury instruction erroneous

because it directed the jury to find the paper's article to be defamatory per se if it found

the article to be false. The court found the instruction mistaken because it allowed the

jury to presume damages without a finding of malice, a ruling that is no longer accepted

law.

The majority in this appeal emphasizes threatening phone calls placed to Robert Caruso after the union's publication and distinguishes the case on appeal with *Caruso v. Local Union* on the basis that Life Designs received no phone calls or threatening messages. Nevertheless, the threatening phone calls were relevant to the damages sustained by Caruso, not to the liability of the union. The reader's response to a defamatory statement has no bearing on whether the statement is defamation per se. *Caruso* does not read to the contrary.

At least three Washington decisions illustrate that Michael Sommer's website entries qualify for defamation per se. In *Wood v. Battle Ground School District*, 107 Wn. App. 550 (2001), this court reversed a summary judgment dismissal of a defamation claim brought by a former employee of the school district against the district board chair. The chairman told a local newspaper that Jennifer Wood's performance as a communications coordinator was "lacking." The court characterized the quotation as defamatory per se.

In *Vern Sims Ford, Inc. v. Hagel*, 42 Wn. App. 675 (1986), Fred Hagel claimed the Ford dealership overcharged him for the purchase of a van. Hagel sent a flyer to approximately one hundred persons in the dealership's community. The flyer read that the dealership and its salesperson were thieves. The trial court awarded damages despite no proof of actual damages since the flyer injured the dealership's business reputation. This court agreed the flyer constituted defamation per se and affirmed the award.

9

No. 32922-4-III
*Life Designs v. Sommer*

In *Waechter v. Carnation Co.*, 5 Wn. App. 121 (1971), a competitor in milk delivery told customers in the community that the plaintiff's milk was not properly refrigerated and therefore contained bacteria injurious to the drinker's health. This court sustained a substantial award despite missing proof of actual damages because the nature of the defamatory statement was defamatory per se.

## FALSITY, FACT, AND OPINION

I must now determine whether Life Designs presents some evidence of all of the elements of defamation, regardless of whether Michael Sommer's comments were defamatory per se. Irrespective of whether the defendant's statements affect the plaintiff's business, the plaintiff must still fulfill the elements of defamation. The majority holds that all remarks on Sommer's website were opinion, not factual, in personality. The majority also holds that Life Designs failed to provide evidence of damages. I address now whether some evidence supports a conclusion that remarks on Sommers' website were factually false. I will later address damages.

Consistent with the majority's ruling, Michael Sommer argues that the contents of his website entirely entail mockery, exaggeration, vituperation, and complaints over pricing and the quality of services received. Sommer asks that this court rule as a matter of law that written grievances from a dissatisfied customer complaining of overcharges and poor service is protected and not defamatory. When Sommer contends that his comments were not defamatory he does not contend that his statements were not negative

10

or hurtful to Life Designs. In other words, he does not argue that the meaning of the words was not defamatory, but he argues instead that his comments were in the nature of opinions and thus not qualifying as defamation. Sommer mentions in passing that an element of defamation is a defamatory statement, but Sommer does not expressly adopt the position that any particular statement could not injure Life Designs' reputation. Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration. *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012); *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

At the outset, the defamation plaintiff must prove the offensive statement is "provably false." *Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*, 114 Wn. App. 371, 379, 57 P.3d 1178 (2002), 64 P.3d 49 (2003); *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. at 590 (1997). A statement can be provably false if it falsely describes the act, condition or event that comprises its subject matter. *Schmalenberg*, 87 Wn. App. at 590. Implications, like plain statements, may give rise to a defamation claim. *Mohr v. Grant*, 153 Wn.2d 812, 823, 108 P.3d 768 (2005). In a defamation by implication case, the plaintiff must show that the statement at issue is provably false, either because it is a false statement or because it leaves a false impression. *Sisley v. Seattle Pub. Sch.*, 180 Wn. App. 83, 87-88, 321 P.3d 276 (2014).

Defamation law distinguishes between fact and opinion. While communication of a false fact may not be privileged, expressions of opinion are protected under the First

11

Amendment and thus are not actionable. *Camer v. Seattle Post-Intelligencer*, 45 Wn.
App. 29, 39, 723 P.2d 1195 (1986).

Certain means of expression qualify as opinion. "Rhetorical hyperbole" is not
actionable as defamation and is constitutionally protected. *Haueter v. Cowles Publ'g
Co.*, 61 Wn. App. 572, 586 (1991). Some statements cannot reasonably be understood to
be meant literally and seriously and are obviously mere vituperation and abuse. *Robel v.
Roundup Corp.*, 148 Wn.2d 35, 55, 59 P.3d 611 (2002), (quoting RESTATEMENT
(SECOND) OF TORTS § 566 cmt. e (1977)).

The law treats some ostensible opinions as facts and actionable in defamation. A
defamatory communication may consist of a statement in the form of an opinion, and a
statement of this nature is actionable if it implies the allegation of undisclosed
defamatory facts as the basis for the opinion. *Camer*, 45 Wn. App. at 39 (quoting
RESTATEMENT (SECOND) OF TORTS § 566 at 170 (1977)). A statement meets the
provably false test to the extent it expresses or implies provable facts, regardless of
whether the statement is, in form, a statement of fact or a statement of opinion. *Valdez-
Zontak v. Eastmont Sch. Dist.*, 154 Wn. App. 147, 225 P.3d 339 (2010). If a direct
statement of facts would be defamatory, then a statement of an opinion implying the
existence of those false facts supports a defamation action. *Henderson v. Pennwalt
Corp.*, 41 Wn. App. 547, 557, 704 P.2d 1256 (1985).

The determination of whether a communication is one of fact or opinion is a

12

question of law for the court. *Benjamin v. Cowles Publ'g Co.*, 37 Wn. App. 916, 922, 684 P.2d 739 (1984). Washington courts have promulgated two complimentary tests to aid a court in making this determination. Under the first test, the court should consider: (1) the entire article and not merely a particular phrase or sentence, (2) the degree to which the truth or falsity of a statement can be objectively determined without resort to speculation, and (3) whether ordinary persons hearing or reading the matter perceive the statement as an expression of opinion rather than a statement of fact. *Benjamin*, 37 Wn. App. at 923; *Camer*, 45 Wn. App. at 39. Even apparent statements of fact may assume the character of opinions, and thus be privileged, when made in public debate, heated labor dispute, or other circumstances in which an audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole. *Camer v. Seattle Post-Intelligencer*, 45 Wn. App. at 41 (1986). In other words, both the immediate as well as broader social context in which the statements occur should be considered. *Camer*, 45 Wn. App. at 41.

Under the second test, to determine whether the words are nonactionable opinions, the court considers the totality of the circumstances surrounding the statements. *Robel v. Roundup Corp.*, 148 Wn.2d at 55 (2002). The court studies (1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies [defamatory] undisclosed facts. *Dunlap v. Wayne*, 105 Wn.2d 529, 539, 716 P.2d 842 (1986); *Robel v. Roundup Corp.*, 148 Wn.2d at 55.

13

Michael Sommer argues that *Robel v. Roundup Corporation* is dispositive in his favor. Linda Robel, an employee of defendant, filed a worker compensation claim. Thereafter imaginative coworkers called Robel pleasantries such as "bitch," "cunt," "fucking bitch," "fucking cunt," "snitch," "squealer," "liar," and "idiot." 128 Wn.2d at 55 (2002). The Supreme Court concluded that, under the circumstances in which the coemployees uttered the names, the words were plainly abusive words not intended to be taken literally as statements of fact. The court applied the *Dunlap* three-factor test. At issue were oral statements made in circumstances and places that invited exaggeration and personal opinion. Those engaging in the name-calling were Robel's coworkers and superiors who were potentially interested in discrediting her complaints to management about questionable food handling practices in the deli or who were personally interested in ostracizing Robel in the workplace. The audience of the statements was Fred Meyer's customers, workers and managers. All would have been aware of the animosity between Robel and other coworkers. Words such as "snitch," "squealer," and "liar" would have registered, if at all, as expressions of personal opinion, not as statements of fact. According to the court, customers hearing the comments would reasonably perceive that the speaker was an antagonistic or resentful coworker.

To determine whether genuine issues of material fact relating to defamatory words and falsity exist, I must necessarily examine the challenged statements against the available evidence. I later explore the context in which Sommer published his

14

statements. Michael Sommer's website no longer exists, so the court may not review the website as a whole, including its design and layout. We must rely on snapshots taken of some of the contents.

I divide the alleged defamatory statements of Michael Sommer into four descriptions: the pine trees, the terrain, the western Washington, and the counselor remarks. The pine trees comment declared:

> **What you get** . . . A visual experience of pine trees, dead pine trees, falling down pine trees, disintegrated pine trees, and more pine trees.

CP at 248. Pine trees grow in the physical world and thus their existence and condition can be perceived objectively. The ordinary person would consider the statement one of fact.

Michael Sommer's comment refers to pine trees five times. On two of the references, he does not write that the pine trees are fallen, injured or ill. A sixth and later reference mentions pine trees without describing them as ill or dead. Thus, the reader could conclude that some beautiful trees lay on Life Designs' land. Sommer does not quantify the number of respiring trees or contrast the quick trees with the dead trees. Life Designs presents evidence that its trees live but does not dispute that its land includes some dismembered, decaying, or dead trees. Therefore, Life Designs presents no issue of fact as to the falsity of the pine trees statement.

Life Designs next complains about Michael Sommer's terrain remark. The website declared:

15

River, can't be seen. Mountains, can't be seen. Civilization, can't be seen. But there are pine trees!!!!!

CP at 248. Whether one can view a river and mountains from a section of land can be determined objectively. The ordinary person would consider the statement one of fact. Life Designs presents evidence countering Michael Sommer's statement denying the scenic view on Life Designs' land.

Michael Sommer likens his terrain remark to one expressing that she was not impressed with a view or landmark by declaring "I don't see what's so great" about the scene or landmark. If so, Sommer inadequately expressed this concept. A reasonable reader could conclude that Sommer accuses Life Designs as misrepresenting its pastoral location by untruthfully claiming a river and mountains can be seen.

Life Designs next complains about a western Washington reference. Sommers wrote:

**What you get** . . . 2 or 3 twelve step meetings a week in a very small western Washington community where the only young adults in attendance are those from Life Designs ranch.

CP at 248.

Life Designs only complains about Sommer's comment that Life Designs ranch lies in western Washington. Washingtonians generally divide the state into eastern and western halves by the Cascade Range. One viewing a map of the Evergreen State may question, however, whether some locations in central Washington should be considered in western or eastern Washington. Nevertheless, no one would conclude that property

16

lying near Cusick, Pend Oreille County, is in western Washington. Pend Oreille County borders Idaho. Michael Sommer's statement is objectively false.

Michael Sommer claims his designating Life Designs ranch as being in or near a western Washington community references the State of Washington as being a western state, not the ranch lying in a western portion of the state. He asserts that his statement meant that Cusick is a "small western community in the State of Washington." Respondent's Br. at 21. The average reader would conclude otherwise. On his website, the word "western" preceded Washington, not community. I am to invest Sommer's words with their natural and obvious meaning.

I question whether Michael Sommer's erroneous location of a dependency recovery ranch in western, rather than eastern, Washington would injure the reputation of the ranch. Perhaps some eastern Washington residents would consider a western Washington location to be intolerable because of the crazy liberals on the west side of the mountains. Nevertheless, the lack of damage to reputation was not argued by Sommer.

Finally, Life Designs complains about Michael Sommer's website statement concerning the experience of counselors at Life Designs Ranch. Sommers declared:

> **You should go to Life Designs if:** . . . You believe that it takes no education or experience with substance abuse, or compassion for the young adult who is recovering from a substance addiction to help them become the person they want to be.

CP at 249.

Michael Sommer did not expressly declare that counselors lacked experience or

17

education with substance abuse or compassion for young people. Nevertheless, reading the website as a whole leads the reader to conclude such. The strong implication is that Life Designs' staff lacks the training, sympathy, and empathy desirous in a substance recovery counselor. Life Designs presents facts refuting the truthfulness of the statement. Criticizing the qualifications of a business' staff injures the business' reputation.

Michael Sommer wrote all of his allegedly false statements on a website critical of Life Designs. Sommer used a web address similar in nature to Life Designs' address. In his deposition, Sommer conceded he used the address to communicate with potential clients of Life Designs. As noted in his June 26, 2012 e-mail message to Life Designs, he intended to destroy the reputation of the addiction recovery center. Sommer did not post his comments on a blog that allowed competing viewpoints. Reading all comments in light of the entire website does little to change the meaning or impression given or soften the sting of the remarks.

The majority discounts Michael Sommer's defamatory statements on the ground that the reader should consider the statements exaggerations of an angry customer. The majority emphasizes the site's language: "Healing is not done and seems to be very limited in it's [sic] attempt." CP at 251. The majority concludes that the word "seems" should lead a reader to consider all statements on the site to be of opinion. I disagree. The site contained some obvious exaggerations of an irate customer, but the Sommer website contained more. The website included provable statements of false fact injurious

18

to Life Designs.

The majority reasons that a reader of Michael Sommer's website could also enter and read Life Designs' authentic website to obtain a countervailing view or the corrected facts. No principle of law excuses defamatory statements on the ground that the reader may find the true facts elsewhere.

In this postmodern information era of history, many consumers glean information about products and services on the Internet. For some young consumers, the web is the only source of information. One is often cautioned about believing everything read on the Internet. But no decision grants immunity for falsehoods posted on the web. Because of ready access to the Internet, such falsehoods may ruin a business' reputation quicker than older forms of communication. One's reputation can be sullied as much by the Internet as the local community grapevine in a bygone era. Because the creator of a website often remains anonymous, the reader is unable to contact the speaker of defamatory words to question the truth of the statements.

The only Washington decision addressing a claim of defamation based on a website is *Janaszak v. State*, 173 Wn. App. 703, 297 P.3d 723 (2013). This court affirmed a summary judgment dismissal of Eric Janaszak's claim based on the Washington Department of Health's posting of, on its website, a notice that the department restricted Janaszak's license for practicing dentistry after he engaged in sex with patients. This court dismissed the suit on the basis of a privilege. Although the

19

State did not argue the point, this court did not suggest that the law of defamation changes when the defendant uttered the defamatory communique on a website.

The Federal Communication Decency Act of 1996 grants immunity from defamation claims to the administrator of a website or an internet service provider. 47 U.S.C. § 230(a). The act does not shield the author of the defamatory statement, even if the author is the administrator of the site. *Ricci v. Teamsters Union Local 456*, 781 F.3d 25 (2d Cir. 2015); *Cisneros v. Sanchez*, 403 F. Supp. 2d 588, 591-92 (S.D. Tex. 2005). Other courts have held defamatory factual statements posted on the Internet, even in chat rooms, can garner liability. *Taylor Bldg. Corp. v. Benfield*, 507 F. Supp. 2d 832 (S.D. Ohio 2007); *Marczeski v. Law*, 122 F. Supp. 2d 315 (D. Conn. 2000); *SPX Corp. v. Doe*, 253 F. Supp. 2d 974 (N.D. Ohio 2003); *Bently Reserve L.P. v. Papaliolios*, 218 Cal. App. 4th 418, 160 Cal. Rptr. 3d 423 (2013); *Too Much Media, LLC v. Hale*, 206 N.J. 209, 20 A.3d 364 (2011).

In *Bently Reserve L.P. v. Papaliolios*, a tenant anonymously posted a review of his former landlord and apartment on the popular Yelp website. The posting read:

> Sadly, the Building is (newly) owned and occupied by a sociopathic narcissist—who celebrates making the lives of tenants hell. Of the 16 mostly-long-term tenants who lived in the Building when the new owners moved in, the new owners' noise, intrusions, and other abhorrent behaviors (likely) contributed to the death of three tenants (Pat, Mary, & John), and the departure of eight more (units 1001, 902, 802, 801, 702, 701, 602, 502) in very short order. Notice how they cleared-out all the upper-floor units, so they could charge higher rents?
> They have sought evictions of 6 of those long-term tenants, even though rent was paid-in-full, and those tenants bothered nobody. And what

20

they did to evict the occupants of unit # 902, who put many of tens of thousands of dollars into their unit, was horrific and shameful.

This is my own first-hand experience with this building, and its owners. I know this situation well, as I had the misfortune of being in a relationship with one of the Building's residents at the time, have spent many days and nights over many years in the Building, and have personally witnessed the abhorrent behavior of the owners of the Building.

There is NO RENT that is low enough to make residency here worthwhile.

218 Cal. App. 4th at 423.

The *Bently Reserve* appellate court affirmed the trial court's denial of the tenant's motion to dismiss the landlord's defamation suit. The tenant claimed that Internet fora are notorious as places where readers expect to see strongly worded opinions rather than objective facts and that anonymous opinions should be discounted accordingly. The court noted that commentators have likened cyberspace to a frontier society free from the conventions and constraints that limit discourse in the real world. The court disagreed and ruled that the mere fact speech is broadcast across the Internet by an anonymous speaker does not make it nonactionable opinion and immune from defamation law.

## HYPERLINK

The organization Human Earth Animal Liberation (HEAL) operated a website critical of Life Designs and other addiction recovery businesses. The website accused Life Designs of functioning like a cult and illegally exploiting student labor. Michael Sommer did not repeat, on his website, the critical remarks made by HEAL on its site. Sommer, however, provided the reader of his site a hyperlink to the HEAL site. I agree

21

with the majority that Sommer, as a matter of law, does not incur liability in defamation for the hyperlink. I need not add to the majority's analysis.

PRESUMED DAMAGES

The majority also affirms summary judgment dismissal of Life Designs' defamation action on the basis that Life Designs failed to submit facts showing Michael Sommer's website caused damages. I disagree for two reasons. First, because Life Designs presented facts supporting defamation per se, Life Designs need not show actual damages. Sommer does not argue that, assuming Life Designs prevails in defamation per se, he need not prove damages. Second, Life Designs provided facts showing damages. This section of the opinion discusses presumed damages for defamation per se.

Since the majority dismisses Life Designs' defamation per se allegation, the majority ignores the rule freeing Life Designs from proving economic loss. Defamation per se is actionable without proof of special damages. *Amsbury v. Cowles Publ'g Co.*, 76 Wn.2d at 737 (1969). Conversely, a defamation plaintiff may recover presumptive damages if he shows he has been referred to by words libelous per se. *Maison de France, Ltd. v. Mais Oui!, Inc.*, 126 Wn. App. at 53-54 (2005); *Haueter v. Cowles Publ'g. Co.*, 61 Wn. App. at 578 (1991). The defamed person is entitled to substantial damages without proving actual damages. *Waechter v. Carnation Co.*, 5 Wn. App. at 128 (1971). Statements falling within the per se categories are thought to be so obviously and

22

materially harmful to a plaintiff that damage can be presumed. *Arnold v. Nat'l Union of Marine Cooks & Stewards*, 44 Wn.2d 183, 187, 265 P.2d 1051 (1954).

Michael Sommer contends that Life Designs cannot prove damages because the business cannot identify anyone who read the contents of Sommer's website. One wonders how Life Designs could locate readers of another's website. Defamation per se is designed to assist businesses like Life Designs that may encounter difficulties in proof. Proof of actual damage will be impossible in a great many cases when, from the character of the defamatory words and circumstances of publication, it is all but certain that serious harm has resulted in fact. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 760 (1985) (quoting WILLIAM PROSSER, *Law of Torts* § 112 at 765 (4th ed. 1971)).

In *Demopolis v. Peoples National Bank of Washington*, 59 Wn. App. 105, 796 P.2d 426 (1990), the trial court directed a verdict in favor of the defendant in a defamation case, in part because plaintiff had proved no damages. This court reversed on the ground that defendant accused plaintiff of a crime. Since plaintiff established an action for defamation per se, plaintiff did not need to prove any actual damages.

In *Maison de France, Ltd. v. Mais Oui!, Inc.*, 126 Wn. App. 34 (2005), the defendant falsely claimed that law enforcement agencies investigated the plaintiff for fraud. The trial court found no economic or other damages and thus denied recovery. This court reversed and directed the trial court to award presumed damages.

23

Some cases refer to "actual damages" and other cases refer to "special damages" as the form of damages not needing proof in defamation per se. Some decisions use both terms. Presumably the two mean the same. *See Haueter v. Cowles Publ'g. Co.*, 61 Wn. App. at 578 (1991). Special damages, according to the *Restatement*, include any pecuniary or economic loss. RESTATEMENT (SECOND) OF TORTS § 575, cmt. b (1977).

## GARRETT DECLARATION

I now address whether, assuming Life Designs did not show facts sufficient to sustain a claim for defamation per se, Life Designs otherwise defeats a summary judgment motion against an argument that it showed no damages to support a defamation suit. Before discussing the law of damages, I must first address an evidentiary question important to this issue.

In opposition to Michael Sommer's summary judgment motion, Life Designs filed an affidavit of its former admissions director, Clay Garrett. Garrett not surprisingly testified that a recovery center's reputation is a primary factor in obtaining clients. Garrett averred that, upon Michael Sommer opening his website, the Life Designs website visits remained constant, but referrals from consultants and clients decreased. Life Designs suffered an approximate fifty six percent decline in referrals during the period when Sommer published the defamatory content to the public. This equates to nine to twelve clients that Life Designs lost because of Sommer's website. Garrett insists

that Sommer's Internet site caused a decline in clients and income. When someone searched the web for Life Designs addiction recovery center, the searcher also was given the web address for Sommer's site.

On appeal, Michael Sommer claims that the trial court struck the declaration of Clay Garrett, because the declaration contained opinions, for which Garrett is not qualified to utter. The record does not support this claim. Regardless, Sommer argues on appeal that this court should ignore the testimony of Garrett. This argument would be dispositive only if Life Designs failed to establish defamation per se. Resolution of the argument looms important in determining whether Life Designs presents an issue of fact as to actual damages.

ER 702 governs testimony by expert witnesses. The rule reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Michael Sommer belittles Clay Garrett's qualifications, in part, because Garrett holds a herpetology degree. Sommer fails to recognize that a witness qualifies as an expert in more ways than education. Witnesses may qualify as experts by practical experience. *State v. Ortiz*, 119 Wn.2d 294, 310, 831 P.2d 1060 (1992); *Acord v. Pettit*, 174 Wn. App. 95, 111, 302 P.3d 1265 (2013). An expert may be qualified to testify by experience alone. *In re Marriage of Katare*, 175 Wn.2d 23, 38, 283 P.3d 546 (2012); *Taylor v. Bell*, 185 Wn. App. 270, 285, 340 P.3d 951 (2014). Once the basic requisite

qualifications are established, any deficiencies in an expert's qualifications go to the weight, rather than the admissibility, of his testimony. *In re Welfare of Young*, 24 Wn. App. 392, 397, 600 P.2d 1312 (1979); *Larson v. Georgia Pac. Corp.*, 11 Wn. App. 557, 524 P.2d 251 (1974).

Clay Garrett qualifies as an expert on the business of addiction recovery, the importance of a business' reputation, factors causing damage to a business' reputation, and the business affairs of Life Designs. Garrett was Life Designs' employee. He began working for Life Designs on December 15, 2010. He became director of admissions in early 2012. As director of admissions, Garrett gained intimate knowledge of the reasons by which clients chose Life Designs and obstacles that impacted that choice.

Clay Garrett worked for ten years at the Dallas Zoological Society and was the director of a scouting program. He later worked as a mentor and field director at a wilderness treatment program for young adults in Santa Clara, Utah. At Life Designs, Garrett worked in many capacities including that of a mentor, life coach, and program and admissions director. As a program and admissions director, Garrett developed new business, helped redesign the business' website, and interfaced with educational consultants who referred clients to recovery centers.

The majority holds that Clay Garrett was qualified as an expert to testify. I readily agree. Whereas, a court may sometimes limit a qualified expert to the scope of his testimony, the majority imposes no limitations on Garrett. The majority instead, in its

26

hurried analysis, fails to recognize the implications of its holding. I address those repercussions later.

## CAUSATION AND DAMAGES

In a defamation action, the plaintiff may recover compensation for damage to reputation, emotional distress, bodily harm, and economic or special damages. *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. at 589 n.56 (1977); RESTATEMENT (SECOND) OF TORTS at 197, 319, 321, 322, 325. The defamation must be the proximate cause of the damages. *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. at 599 n.56. Even if Life Designs failed to establish defamation per se, it presents sufficient facts to defeat a motion to dismiss its defamation claim on the elements of causation and damages.

Michael Sommer emphasizes the rule of logic caged in the Latin locution: "post hoc, ergo propter hoc" or "after this, therefore because of this." The axiom should be stated in the converse: an event or condition is not necessarily caused by an occurrence or circumstance that preceded it. According to Sommer and the majority, Life Designs does not create an issue of fact by showing that its business declined after Sommer began his website.

In *Anica v. Wal-Mart Stores, Inc.*, 120 Wn. App. 481 (2004), this court relied on this logical fallacy when affirming a summary judgment dismissal of Lorena Anica's claim of wrongful termination from employment. Wal-Mart terminated Anica's

27

employment after her return to work from time off to recover from her second job injury. Anica argued that the timing of her termination provided sufficient evidence of causation to survive a summary judgment motion. Evidence, however, verified that the Social Security Administration had recently contacted Wal-Mart and notified the store that Anica's social security number was false. After Anica failed to fix the number anomaly, corporate offices told the local store to fire Anica.

*Anica v. Wal-Mart Stores* must be contrasted with *Borden v. City of Olympia*, 113 Wn. App. 359, 53 P.3d 1020 (2002). The Bordens sued Olympia after their property flooded. In November 1995, the city completed a new stormwater drainage system near the Borden land. In February 1996, ponds formed in the Borden's yard and the basement flooded. The flooding continued thereafter. When the city redesigned the system and redirected the wastewater flow, the flooding ceased. The Bordens complained that Olympia negligently designed the 1995 system. The trial court granted the city summary judgment. On appeal, this court determined that facts supported a breach of duty and causation of damages. This court reversed the summary judgment on the negligence claim.

The *Borden* Court asked whether a trier of fact could rationally find that Olympia's project proximately caused damage to the Bordens. Taken in the light most favorable to the Bordens, the record showed that flooding to their property started the first winter after the 1995 project was completed. The flooding recurred each winter for

28

the next several years. The flooding subsided when another drainage facility channeled water away from the Bordens' land and into the headwaters of a nearby creek. According to the court, this coincidence in timing gave rise to an inference that the flooding was a proximate result of the 1995 drainage project.

Based on *Anica v. Wal-Mart Stores*, timing may not be sufficient on its own to raise a question of fact of causation. Nevertheless, according to *Borden v. City of Olympia*, timing is a significant factor to consider.

The majority distinguishes *Borden v. City of Olympia* on two grounds. First, the Bordens sued the city for negligence, not defamation. The majority intimates that the rules of causation change in a defamation action. The majority cites no law for this implication. There is no law. If the majority's implied ruling is correct, the majority should avoid principles discussed in *Anica v. Wal-Mart*, since *Anica* is not a defamation suit.

The majority also distinguishes *Borden v. City of Olympia* with the important distinction that the flooding of the Bordens' property ended when Olympia redesigned its storm drainage system. Life Designs presented no testimony that its business recovered after Michael Sommer removed his website. Of course, Life Designs can argue that the damage had been done and the cessation of the website did not restore its reputation. Redesigning the city stormwater system physically changed the flow of the water, whereas defamatory statements may linger in the minds of hearers long after the

29

defendant ceases publication of the statements. Defamation's stormwaters may persist even after a redirection.

*Borden v. City of Olympia* and the majority's ruling may be based on the principle that when damage ends after defendant's wrongful conduct ends, the plaintiff proves causation. This ruling is also logically false under the same principle. Just because the Bordens' flooding ended after the city redesigned its system does not mean that the redesign ended the flooding. Of course, *Borden* has two critical events that assist in resolving causation, the beginning of operations of the system project and cessation of the system. Logicians have yet to announce the fallacy of "after this but not after this endeth, therefore this."

Some commonsense based on experience should enter the discussion of causation. When a man bangs his head against the wall, after which his head hurts, we conclude that the banging caused the hurt. When a woman is in a rear end collision, after which her neck hurts, the law allows a physician to testify that the car accident caused a whiplash, regardless of whether imaging studies confirm the lack of soft tissue injury before the accident or presence of tissue injury after the accident. An injured party's testimony alone of pain after an accident is sufficient to permit the jury to award damages for that pain and future pain. *Bitzan v. Parisi*, 88 Wn.2d 116, 122, 558 P.2d 775 (1977). For purposes of a summary judgment motion, the law accepts the truthfulness of the accident

30

victim when she states that after an accident she garnered pain and therefore the pain is related to the accident. The jury can later judge the credibility of the victim.

The law might permit Clay Garrett to testify as a lay witness that the defamation published by Michael Sommer caused Life Designs damages. The majority has gone one step further and qualified Garrett as an expert witness. He is in a similar position to a treating physician in a personal injury suit.

Clay Garrett avers that, during the time Michael Sommer operated his website, Life Designs' referral rate plummeted by fifty six percent and the business lost five to nine clients. Based on his experience, Sommer opined that the website caused the lack of business. No case requires Life Designs to identify a lost costumer as a condition to recovering lost income. Thus, Life Designs presents a jury question of damages. A trier of fact can later decide the credibility of Garrett's testimony. Michael Sommer raises a good argument that the HEAL website could have caused all of Life Designs' damages. This good argument should be presented to the jury.

The majority criticizes the reasoning and the relevance of the data on which Clay Garrett justified his opinion. Once this court qualified Garrett as an expert, however, Garrett did not even need to disclose the facts or data on which he supported his conclusion. ER 705.

Michael Sommer should not be surprised that his website caused a loss of business to Life Designs. He threatened to harm Life Designs' reputation. Damage to Life

31

Designs was Sommer's stated goal. In his June 26 message to Vince Barranco, Sommer wrote, in part:

> I am willing to get legal with this. Are you? I would hope that the most important thing to you is your reputation. We all know how easily reputations can be destroyed, without the legal system even getting involved. But I would go both routes if I have to.

CP at 257.

The elements of damages and causation run together in this case. Proximate cause has two elements, cause in fact cause and legal causation. *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998). Cause in fact asks whether damages would have occurred but for the wrongful conduct of the defendant. *Hartley v. State*, 103 Wn.2d 768, 778, 698 P.2d 77 (1985). Legal causation addresses policy considerations as to how far the consequences of defendant's acts should extend. *Hartley v. State*, 103 Wn.2d at 779. A proximate cause is one that in natural and continuous sequence, unbroken by an independent cause, produces the injury complained of and without which the ultimate injury would not have occurred. *Schooley*, 134 Wn.2d at 478; *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 935, 653 P.2d 280 (1982). The plaintiff need not establish causation by direct and positive evidence, but only by a chain of circumstances from which the ultimate fact required is reasonably and naturally inferable. *Teig v. St. John's Hosp.*, 63 Wn.2d 369, 381, 387 P.2d 527 (1963); *Conrad ex rel. Conrad v. Alderwood Manor*, 119 Wn. App. 275, 281, 78 P.3d 177 (2003).

Generally, the issue of proximate causation is a question for the jury. *Bernethy v.*

*Walt Failor's, Inc.*, 97 Wn.2d at 935 (1982); *Attwood v. Albertson's Food Ctr., Inc.*, 92 Wn. App. 326, 330, 966 P.2d 351 (1998). Only when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion may the court remove the question from the jury. *Bernethy*, 97 Wn.2d at 935. In its abbreviated analysis, the majority weighs the facts relevant to causation. By ruling as a matter of law on the issue of damages, the majority usurps the role of the jury.

A foreign decision of limited relevance is *State Farm Fire & Casualty Company v. Radcliff*, 987 N.E. 2d 121 (Ct. App. Ind. 2013). State Farm sued Joseph Radcliff and Radcliff's company for fraud and racketeering arising out of Radcliff's assistance to State Farm policyholders in recovering damages for a large hailstorm in central Indiana. Radcliff counterclaimed for defamation because of State Farm's broadcasting of Radcliff engaging in fraudulent and criminal practices. The Indiana Court of Appeals affirmed a $14.5 million verdict in favor of Radcliff. In affirming the verdict, the appellate court rejected State Farm's argument that the trial court impermissibly allowed Radcliff's economic expert to testify that articles on the Internet, prompted by State Farm's allegations, created a negative situation for Radcliff that impacted his business prospects in the future. The expert exclaimed "the challenge with the internet is that once something is on the internet, it's virtually impossible to get rid of it." *State Farm Fire & Cas. Co.* 987 N.E.2d at 154 (Ct. App. Ind. 2013).

33

## FALSE LIGHT

I concur with the majority that a corporation may not recover for the tort of false light. I also concur that Vincent and Bobbie Barranco did not show damages to sustain an action in false light.

## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

The majority writes that Life Designs created issues of fact as to each substantive element of the tort of interference with a business expectancy. I agree. Thus, I will not list the elements of the tort or analyze the evidence in relationship to all elements.

The majority affirms summary judgment dismissal of the tortious interference cause of action on the basis that Life Designs has not presented evidence of damages. Resultant damage is an element of the tort. *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997). In reviewing the evidence on appeal, the majority conducts the same analysis performed when holding that Life Designs showed no damages to support its defamation claim. The majority writes that no potential client or referral source submitted an affidavit establishing that he or she did not choose Life Designs because of Michael Sommer's website. The majority cites no authority for the proposition that the plaintiff must present evidence from a customer or potential customer in order to sustain a claim for tortious interference. Washington law imposes no such requirement.

Fearing, J.

Fearing, J.

34